# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| VRNS II, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No: CPU4-22-002095 |
| | ) | |
| JOSEPH DESMARIAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: April 8, 2025
Decided: June 9, 2025

John R. Weaver Jr., Esquire
2409 Landside Drive
Wilmington, DE 19810
(302) 655-7371
*Attorney for Plaintiff*

Robert C. McDonald, Esquire
1523 Concord Pike, Suite 400
Wilmington, DE 19803
(302) 888-2900
*Attorney for Defendant*

## DECISION AFTER TRIAL

**Danberg, C.J.**

This is a breach of contract action which stems from an agreement between Plaintiff VRNS II, LLC ("VRNS") and Defendant Joseph Desmarais for the demolition and removal of a structure located on VRNS's property. On April 8, 2025, the case proceeded to trial. At the conclusion of trial, the Court reserved decision. This is the Court's final decision after trial.

## FACTS AND PROCEDURAL HISTORY

At the crux of this litigation is an agreement which was negotiated by Mr. Desmarais and VRNS's property manager, Praveen Patel. In fact, nearly all the communications relevant to this litigation were between Mr. Desmarais and Mr. Patel. However, Mr. Patel was not called to testify at trial, and VRNS did not offer testimony from any other person with first-hand knowledge of the communicative exchanges between Mr. Desmarais and Mr. Patel. Consequently, there were some gaps in the narrative surrounding the parties' dealings, particularly from the perspective of VRNS. However, as finder of fact, the Court is tasked with reconciling any discord in the evidence presented and drawing inferences from the proven facts.[1] Based on the testimony and evidence presented at trial, the Court finds the relevant facts as follows:

---

[1] *LG Electronics Inc. v. Invention Investment Fund I, L.P., et al.*, 2025 WL 1531375, at *3 (Del. Super. May 15, 2025); *Zenith Energy Terminals Joliet Holdings LLC v. CenterPoint Properties Trust*, 2024 WL 3570165, at *3 (Del. Super. July 29, 2024)(as the fact finder in a bench trial, "[t]he Court considers each witness's means of knowledge; strength of memory; [and] opportunity to observe").

Mr. Patel contacted Mr. Desmarais for an estimate on the cost to demolish a house located on a property owned by VRNS in Wilmington, DE (the "Property").[2] In this instance, projection of costs was complicated by the fact that Mr. Desmarais would not be able to survey the Property in advance; the costs of demolition could vary depending on the materials from which the house located on the Property was made and the nature and extent of any contents therein.[3] To that end, Mr. Desmarias cautioned Mr. Patel that the house's contents could be more extensive than they anticipated. However, Mr. Desmarias had worked for VRNS in the past, and it had been the parties' practice that Mr. Desmarias would provide an initial estimate, then submit a final invoice—which almost always exceeded the initial estimate—once the work was completed.

Based on his communications with Mr. Patel and consistent with their past dealings, Mr. Desmarias provided a written estimate (the "Estimate"), which served as the only documented commemoration of the parties' agreement. The Estimate provided that, for a projected cost of $23,000, Mr. Desmarias would remove the

---

[2] Mr. Desmarais was the operating under the assumed name "A&L Repairing & Contracting." A&L Repairing & Contracting is a fictitious name and is not registered business.
[3] The exact reason that Mr. Desmarais was precluded from viewing the structure in advance was unclear, but it was Mr. Desmarais' understanding that his access was limited due to a death on the Property.

utilities and the house,[4] then fill the area with stone, gravel, and dirt.[5] Notably, removal of the yet-unknown contents of the house was not included in the Estimate. Also, critically absent from the Estimate was any guarantee or approximation with regards to timing; in fact, even the Estimate itself was undated. It did require that a 50% deposit before the project started,[6] but made no reference as to when that start date would be, how long the project would take, a date certain by which the work was to be completed, or any other indication that time was of the essence.

Perhaps unsurprising given the lack of temporal detail in the Estimate, the actual timeline of events attested to at trial was imprecise.[7] Records show that Mr. Desmarais received the deposit as of January 15, 2022,[8] and the demolition permit was issued on February 16, 2022. The permit was for a three-month period, expiring on May 16, 2022.

---

[4] The Estimate also included reference to a fence. It is unclear what action the parties intended with regards to a fence (e.g., whether a fence was to be installed or removed). However, whether Mr. Desmarais satisfied his contractual obligations with regards to the fence was not addressed at trial.

[5] The estimated cost also incorporated requisite permits and bond.

[6] The precise language in the Estimate was "DEPOSIT REQUIRED BEFORE STARTING ½ DEPOSIT."

[7] Mr. Desmarais candidly testified that he was uncertain of when, exactly, certain events took place.

[8] Per the terms of the Estimate, a deposit in the amount of $11,500 (i.e., 50% of the $23,000 estimate) was due before work would begin. Records show that Mr. Desmarais was issued a check in the amount of $8,000 on November 29, 2021. A second check was issued in the amount of $6,000 on January 15, 2022, for a total of $14,000. Pl. Ex. 1.

4

Mr. Desmarais' original plan of action was to demolish the structure, sort the rubble by material, then remove the rubble using dumpsters.[9] About a week after the permit was issued, Mr. Desmarais' equipment arrived at the Property. He also had 40 tons of dirt delivered, which he expected would be enough to fill in the hole once the house was removed.

Work began on or around February 23, 2022. Demolition of the house itself was quick work; Mr. Desmarais collapsed the structure in one day. However, the sorting and disposal of materials was complicated by the house's sizeable inventory. He described the rooms as "filled...floor to ceiling" with "every piece of furniture you could ever imagine. . . clothes and TVs," which made it "nearly impossible to separate." Mr. Desmarais' observations were seemingly validated by VRNS's owner and CEO, Vinod Patel, who testified that the residence had been occupied by "hoarders."

Time was not the only resource drained by the home's sizeable contents; the fees to remove such expanse of rubble would be significant. In addition to a per-ton fee, a $550 fee was imposed to dump and exchange each dumpster. According to Mr. Desmarais, they removed 20 tons worth of debris from the Property, but that

---

[9] Mr. Desmarais explained that sorting is done because of the considerable disposal cost differential; some recyclable materials can be disposed of at a fraction of the cost of debris taken to a landfill. He elaborated that things like concrete and stone can be dumped for about $25 per ton and lumber can be taken to salvage for about $40 per ton, while the landfill charges $90 per ton.

"didn't even put a dent in it." So, on March 2, 2022, he met with Mr. Patel and advised that additional money would be needed to remove the debris, and suggested that they save some expense by purchasing a dump truck to avoid the $550-per-dumpster fee. Mr. Patel confirmed that necessary overages would be covered.

Later that same day, Mr. Patel and Mr. Desmarais met again for Mr. Patel to provide Mr. Desmarais a check for the balance of the Estimate. However, Mr. Patel tendered a check for $8,000—which was $1,000 short of the amount owed on the Estimate—and indicated that the balance would be paid once the job was completed. He also advised that no overages would be paid on the project. Nevertheless, Mr. Desmarais decided to proceed with purchasing a dump truck and finishing the job with no additional labor charges. He explained that he wanted to finish the job because he liked working for the company and they had given him lucrative projects in the past.

Mr. Desmarais did purchase a dump truck, but it needed repairs, which caused work on the project to pause while the dump truck was repaired. Mr. Patel was aware of the reason for the delay and frequently called to check on the status of the repairs. However, in his near daily calls to Mr. Desmarais, Mr. Patel never communicated a deadline to finish the project, nor did he indicate that Mr. Desmarais was at risk of being replaced due to the delay. Mr. Patel and Mr. Desmarais last

spoke in early or mid-May 2022, about two days before the repairs were finished and Mr. Desmarais returned to the jobsite.

At some point in May 2022, before the demolition permit expired (i.e., before May 16th), Mr. Desmarais returned to the jobsite with his freshly repaired dump truck. He anticipated that, finishing the job by himself to avoid further labor costs, he could clear the remaining debris within two weeks. However, upon arrival, Mr. Desmarais discovered that he had been replaced on the project, as evidenced by the presence of dumpsters and equipment belonging to another contractor. So, he removed his posted permit and left the job.

Vinod Patel ("Mr. Vinod"), the owner and CEO of VRNS, testified regarding the decision to replace Mr. Desmarais on the project. While Mr. Desmarais maintains that he had continuous contact with Mr. Patel, Mr. Vinod testified that Mr. Patel had claimed he was unable to reach Mr. Desmarais. Mr. Vinod explained that, around the same time, the County was putting pressure on him to complete the project and that he received an environmental violation. Believing that Mr. Desmarais was unreachable, VRNS contracted with several other vendors—Antonio's General Contracting, Waste Masters Solutions, and Orange Cans, Inc.—to separate and remove the remaining debris.

At the time Mr. Desmarais was replaced, the house had been leveled, the fill dirt was on site, and a portion of the debris had been removed, albeit a comparably

7

nominal portion. The new contractors finished the job at the end of May or early June at the cost of $43,916.30 to VRNS.[10] However, the corresponding invoices did not distinguish costs related to removal of the house debris from costs related to removal of the house content debris.

## DISCUSSION

To recover for breach of contract, the plaintiff must prove, by a preponderance of the evidence, that (1) the parties had a contract, (2) the defendant breached an obligation under the contract, and (3) the plaintiff suffered damages due to the breach.[11]

The parties concede the existence of an agreement whereby Mr. Desmarais agreed to perform a demolition project on VRNS's Property, and VRNS agreed to pay Mr. Desmarais for his work. Further, Mr. Desmarais concedes that he walked off the job before the project was completed, and VRNS concedes that it replaced Mr. Desmarais before the project was completed—both acts which, viewed in isolation, would constitute breach of the agreement. However, where one party

---

[10] Of the total cost, $14,894.30 was attributable to debris dumping fees ($90/ton plus $550/dumpster); $27,000 of the total cost was for the equipment and actual work performed to remove the debris; and the remaining $2,022 was for the rental of dumpsters for concrete materials and trash. Pl. Ex. 1.

[11] *Gregory v. Frazer*, 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010); *VLIW Tech., LLC v. Hewlett-Packard, CO.*, 840 A.2d 606, 612 (Del. 2003).

breaches the agreement, the other is excused from performance.[12] Thus, the question before the Court is: which party breached first?

VRNS argues that Mr. Desmarais breached the agreement in that he failed perform any work on the job following the March 2, 2022, payment, failed to communicate when the job would be completed, and ultimately did not finish the project. Mr. Desmarais argues that the parties did not discuss a deadline for completion and VRNS never expressed concern with the timing of Mr. Desmarais' work, thus his failure to complete the project by mid-May 2022 was not a breach of the agreement.

Here, the Estimate did not contain a deadline for completion, and VRNS does not contend that Mr. Desmarais agreed to complete the project by a date certain. However, a lack of a fixed performance term does not insulate Mr. Desmarais from liability for untimely performance. Under Delaware law, where a contract fails to specify a time for performance, the court will imply a reasonable time,[13] for "[i]n every contract there is implied a promise or duty to perform with reasonable expediency the thing agreed to be done; a failure to do so is a breach of contract."[14]

---

[12] *SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *15 (Del Super. April 2, 2003).
[13] *Stone Creek Custom Kitchens & Design v. Vincent*, 2016 WL 7048784, at *4 (Del. Super. Dec. 2, 2016).
[14] *Comet Systems, Inc. Shareholders' Agent v. MIVA, Inc.*, 980 A.2d 1024, at 1034 (Del. Ch. Oct. 22, 2008)(citing 23 Williston on Contracts § 63:24 (4th ed.).

9

## A. Would the Agreement Have Been Completed Within a Reasonable Amount of Time

Here, Mr. Desmarais made no representation of how long it would take him to complete the project. While VRNS may have wanted the project to be completed expeditiously, there was no evidence that such a conversation occurred or was written in the Agreement. The evidence presented was that hoarders previously inhabited the structure on the Property and that copious amounts of debris had to be hauled away. Faced with the cost of debris removal, both parties agreed it would be mutually beneficial for the Mr. Desmarais to purchase a dump truck. This eliminated the need to pay for a dumpster and the associated fee for each disposal.

Further, Mr. Desmarais testified at trial that he had continuously updated Mr. Patel with the circumstances surrounding the truck. Effectively notifying VRNS that Mr. Desmarais would not be able to complete the job until he repaired the truck and received a temporary registration. Mr. Desmarais also stated at trial that he would have been able to complete the project within two (2) weeks upon his arrival with the truck. Moreover, VRNS failed to offer evidence or testimony refuting Mr. Desmarais' claim. In fact, the contractors VRNS subsequently hired completed the remainder of the work within roughly two weeks.

VRNS elected not to have Mr. Patel testify, and the Court may not speculate what his testimony would have been; however, this decision left Mr. Desmarais

10

testimony regarding the history of how the parties previously conducted business unchallenged. This testimony, which on its own was credible, also buttressed Mr. Desmarais' testimony regarding his ongoing communications with Mr. Patel.

This leads the Court to conclude that during this job, something happened, which caused the VRNS to deviate from the normal course of business in this relationship. Perhaps it was the pressure from the community or the County. Regardless, the Court concludes that VRNS created an expectation that the Agreement would be completed in a time frame not contemplated or provided for in the Agreement. Thus, Mr. Desmarais did not commit a material breach.

## B. Was Mr. Desmarais Unjustly Terminated from the Project

In determining that Mr. Desmarais' actions were reasonable, the Court now turns to whether Mr. Desmarais was unjustly removed from the project. At trial both parties readily admit that Mr. Desmarais was never informed that he was terminated from the Agreement. Mr. Desmarais testified that he only realized his termination after observing another contractors' equipment at the property. In fact, Mr. Desmarais' belief was accurate; Mr. Patel testified that he was replaced by other contractors.

Mr. Desmarais consistently testified that he kept Mr. Patel updated on his anticipated return to the site and his projected completion of the project. Despite this ongoing communication, Mr. Desmarais received no indication hat his continued

11

absence would lead to termination. Furthermore, Mr. Vinod testified that his only communication with Mr. Desmarais was indirectly through Mr. Patel. The sole piece of communication presented by the VRNS was a letter mailed to the Mr. Desmarais after his termination and after the work had already been completed by other contractors.

A unilateral attempt to terminate a contract is a repudiation.[15] If the contract does not provide a right to unilaterally terminate the contract, then the repudiation does not terminate the contract, it breaches the contact.[16] The Agreement did not provide any right for either party to unilaterally terminate the contract. Therefore, the VRNS's replacement of Mr. Desmarais, even without informing him, acted as a repudiation and, thus, constituted a breach of contract.

---

[15] *Mueller v. Marvel*, 2004 WL 7325622, at *2 (Del. Com. Pl. Dec. 8, 2004).
[16] *Id.*

12

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendant Joseph Desmarias and against Plaintiff VRNS II, LLC. Consequently, VRNS is precluded from recovering damages pertaining to the completion of the Agreement. Each party shall bear their own costs.

**IT IS SO ORDERED.**

The Honorable Carl C Danberg
Chief Judge